UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

| | |
|---|---|
| In re: | Chapter 11 Cases |
| TM Healthcare Holdings, LLC, *et al.*,[1] | Case No. 20-20024-EPK (Jointly Administered) |
| Debtors. | |

_____/

### NOTICE OF FILING DECLARATION OF PAUL KAMPS, CHIEF FINANCIAL OFFICER OF TM HEALTHCARE HOLDINGS, LLC, <u>IN SUPPORT OF DEBTORS' FIRST DAY MOTIONS</u>

The Debtors hereby file the attached Declaration of Paul Kemps in support of their first-day motions.

### <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via CM/ECF Notice of Electronic Filing to all parties registered to receive electronic noticing in this case on this the 17th day of September, 2020.

### <u>ATTORNEY CERTIFICATION</u>

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida, and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

SHRAIBERG, LANDAU & PAGE, P.A.
Proposed Attorneys for the Debtor
2385 NW Executive Center Drive, #300
Boca Raton, Florida 33431
Telephone: 561-443-0800
Facsimile: 561-998-0047
Email: bss@slp.law

By: */s/ Bradley S. Shraiberg*
      Bradley S. Shraiberg
      Florida Bar No. 121622

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: TM Healthcare Holdings, LLC (2041), Golden Gate Holding Company, LLC (4501), Pacific Addiction and Treatment Company, LLC (9325), SoCal Addiction & Treatment Company, LLC (6458), West Coast Recovery Center, LLC (1335), West Coast Wellness Centers, LLC (0561), Golden Gate Employment Services, LLC (6182), Bass Holding Company, LLC (2034), Treatment Management Company, LLC (3447), Wellness Management Company, LLC (2832), Wellness Counseling & Residential Detoxification Services, LLC (1783), and Bass Employment Services, LLC (6354).  The Debtors' headquarters are located at 770 SE Indian Street, Stuart, Florida 34997.

{2360/000/00507756}

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:                                                    Chapter 11 Cases

TM Healthcare Holdings, LLC, *et al.*,[1]                 Case No. 20-20024-EPK
                                                          (Joint Administration Pending)

          Debtors.

_____/

**DECLARATION OF PAUL KAMPS, CHIEF**
**FINANCIAL OFFICER OF TM HEALTHCARE**
**HOLDINGS, LLC, IN SUPPORT OF DEBTORS' FIRST DAY MOTIONS**

          I, Paul Kamps, hereby declare under penalty of perjury:

          1.          My name is Paul Kamps.  I am over the age of 18 and am competent to testify.  I

am the Chief Financial Officer ("CFO") of TM Healthcare Holdings, LLC and its

above-captioned affiliates (each, a "Debtor," and collectively, the "Debtors").

          2.          To minimize any adverse effects on the Debtors' business as a result of the

commencement of the above-captioned chapter 11 cases on September 17, 2020 (the "Petition

Date"), the Debtors intend to request various types of relief in certain "first day" applications and

motions (collectively, the "First Day Motions").[2]  The First Day Motions are designed to, among

other things: (i) continue the Debtors' operations while in chapter 11 with as little disruption as

possible; (ii) allow the Debtors to continue providing patient quality care and operate their

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: TM Healthcare Holdings, LLC (2041), Golden Gate Holding Company, LLC (4501), Pacific Addiction and Treatment Company, LLC (9325), SoCal Addiction & Treatment Company, LLC (6458), West Coast Recovery Center, LLC (1335), West Coast Wellness Centers, LLC (0561), Golden Gate Employment Services, LLC (6182), Bass Holding Company, LLC (2034), Treatment Management Company, LLC (3447), Wellness Management Company, LLC (2832), Wellness Counseling & Residential Detoxification Services, LLC (1783), and Bass Employment Services, LLC (6354).  The Debtors' headquarters are located at 770 SE Indian Street, Stuart, Florida 34997.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the applicable First Day Motion.

business pending a restructuring of the Debtors' outstanding debt obligations; (iii) maintain the Debtors' value as a going concern; and (iv) establish procedures for the smooth and efficient administration of these chapter 11 cases.  The relief requested in the First Day Motions will be crucial to the success of the Debtors' efforts to facilitate an orderly reorganization or liquidation under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

3.      I submit this declaration (the "Declaration") in support of the Debtors' voluntary chapter 11 petitions and accompanying First Day Motions.  As the CFO, I have personal knowledge of the Debtors' books and records and the Debtors' financial and operational affairs. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees or advisors.  In making the statements herein based upon my review of the foregoing, I have relied upon these employees and advisors to accurately record, prepare, and collect any such documentation and other information.

4.      If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or my personal opinion, except as otherwise noted.  I am authorized to submit this Declaration on behalf of the Debtors.

## PRELIMINARY STATEMENT

5.      The Debtors are affiliates under a single corporate structure that operate addiction and treatment medical facilities in Florida, California, and formerly Arizona.  The Debtors' licensed detox and residential treatment facilities provide, among other things, advice and

counseling, medical and related services, and a supportive environment to those suffering from mental health problems and alcohol and substance abuse.

6.       The Debtors are owned by trust set up by the Deering family and were created out of the family's love for Nick Salas, who previously struggled with addiction but who is now sober,   In a prior life, Bryan T. Deering, Sr. ("Deering Sr.") became very successful in Florida's construction industry and was blessed to retire at an early age.  For many years, Deering Sr.'s oldest son, Nick, suffered from mental health problems and drug addiction.  On one life changing occasion following retirement, Deering Sr. and his wife were notified that their son had overdosed.  Deering Sr. and his wife rushed to the scene only to catch a glimpse of their son being placed in the back of an ambulance.  As a result of the overdose, Nick remained in a coma for two weeks where he suffered two heart attacks and at least one stroke.  The doctors eventually informed the Deering family that Nick was brain dead and following the unimaginable act of saying goodbye to their loved one, Nick miraculously woke up and survived. Nick had to relearn how to use his motor functions.  Nick continued to struggle with his addiction but eventually was able to get clean through his experiences—good and bad—at various treatment facilities and the love and support of his family.

7.       After getting clean, Nick was offered, and eventually took, a job at an addiction treatment center in Stuart, Florida in September of 2012; however, the treatment facility was going to close under the pressures of financial distress.  Nick informed Deering Sr. of the situation, and forever touched by the treatment industry that had saved his son's life, became a silent investor.  Shortly thereafter, in or around December 2012, Deering Sr. took over the treatment facility after its prior owner stepped away for personal reasons.  The treatment facility became a family practice with the entire Deering family participating in the treatment facility in

some way, shape or form.  Through the Deering family's ownership of the treatment facility and his tireless efforts to remain addiction free, Nick remains sober, employed, and a functioning member of society providing help and guidance to those suffering from alcohol and substance addictions and mental health problems.  Through the most difficult opioid crisis this country has ever seen, the unit holder and the Debtor has helped thousands of people through treatment and saved countless lives. The Debtor has provided treatment to hundreds of client patients who come in as scholarships, knowing that the Debtor would not be reimbursed for their care.

### OVERVIEW OF THE DEBTORS' CORPORATE STRUCTURE

8.    TM Healthcare Holdings, LLC ("TM Healthcare Holdings") is a limited liability company organized under the laws of Delaware.  The equity interests of TM Healthcare Holdings is held by: (i) The Bryan T. Deering, Sr. Irrevocable Family Trust, dated January 8, 2015, with a 49.5% (nonvoting) interest; (ii) The Debra A. Deering Irrevocable Family Trust, dated January 24, 2014, with a 49.5% (nonvoting) interest; and (iii) The Bryan T. Deering, Sr. Living Trust, dated January 31, 2011, with a 1% (voting) interest.  TM Healthcare Holdings is the parent company and holds 100% of the equity interest in regional holding Debtor entities Golden Gate Holding Company, LLC ("Golden Gate Holding") and Bass Holding Company, LLC ("Bass Holding").

9.    Golden State Holding is a limited liability company organized under the laws of California.  Golden State Holding is the parent company of the following Debtor subsidiaries: (i) Pacific Addiction and Treatment Company, LLC; (ii) SoCal Addiction & Treatment Company, LLC; (iii) West Coast Recovery Center, LLC; (iv) West Coast Wellness Centers, LLC; and (v) Golden Gate Employment Services, LLC (collectively, the "California Debtor Entities").  The California Debtor Entities are organized under the laws of California.  Golden

Gate Holding and the California Debtor Entities help operate the Debtors business operations in California.

10.    Bass Holding is a limited liability company organized under the laws of Florida. Bass Holding is the parent company of the following Debtor subsidiaries: (i) Treatment Management Company, LLC; (ii) Wellness Management Company, LLC; (iii) Wellness Counseling & Residential Detoxification Services, LLC; and (iv) Bass Employment Services, LLC (collectively, the "<u>Florida Debtor Entities</u>").  The Florida Debtor Entities are organized under the laws of Florida.  Bass Holding and the Florida Debtor Entities help operate the Debtors business operations in Florida.

11.    For reference, please see the Debtor's Legal Organization Chart attached as **<u>Exhibit A</u>**.

<div align="center">

**<u>THE DEBTORS' HISTORICAL FINANCIAL PERFORMANCE</u>**

</div>

12.    Upon the Deering family taking ownership over the Debtors, the Debtors were very successful and profitable for the first few years under the Deering family.  At their height, the Debtors collectively generated hundreds of millions of dollars in revenues per year.  In 2015, however, the drug and alcohol treatment facility industry at large experienced a downturn. Despite glaring statistics on drug and alcohol addiction and deaths in the United States, insurance companies stopped reimbursing certain expenses incurred by patients for necessary, life-saving medical expenses resulting in the Debtors' collection rates from insurance providers dropping from 50-60% to 20-30%.  At the same time, the industry began to receive negative publicity because of fraudulent billing practices committed by a few owners of drug and alcohol treatment facilities.

13.     In 2016, the Debtors had very strong cash flow and a bank balance in excess of $25,000,000.   At the time and before the above described events, the Debtors hired an investment banker to represent the Debtors in a possible sale. The Debtors attracted an offer of interest to acquire the business of approximately $60,000,000. At the time, the Debtors had no debt on their books and were advised by the investment bank who were advising them in the sale process to seek financing.  It was at this time that Keybank extended an unsecured line of credit to the Debtors in an initial amount of $30,000,000.  The Debtors were advised to draw down on the line by the investment banker and was in fact also encouraged to do so by Keybank.  The Debtors at the time did not need to avail itself and draw on the line of credit but did so following investment bank advice in anticipation of a future transaction.  The owners of the Debtors were also not averse to the Debtors drawing on the line, as Keybank was not requiring a personal guarantee, instead being comfortable with a security interest in the Debtors' assets. Given the Debtors' then very strong financial position (cash on hand, business profitability, revenues in excess of $200,000,000 and over 1,200 employees in three states) and presence in a health care industry sector that was in need because of the opioid crisis resulting in the significant increase in people seeking substance abuse treatment, the Debtors availed themselves of the line of credit even though they did not need it given their strong financial performance.

14.     During this same period of time, insurance companies were experiencing tremendous financial pressure related to the explosion in treatment related to reimbursements for substance abuse as a result of the opioid crisis.  The insurance companies had not included in their financial modeling the large increase in young adults seeking substance abuse services tied to the wide availability of opioids in the United States and the disastrous impact this was having on what were historically a demographic that were an occasional user group for health care

services.  Young adults in the 18 to 28 age group saw a dramatic increase in the use of health care services specifically in the substance abuse sector.  In addition, the changes described above related to the passage of the Affordable Care Act exacerbated the situation.

15.    Part of the response of the insurance companies was to delay or deny claims and also to require changes in treatment protocols.  Historically these protocols were based on the American Society of Addiction Medicine ("ASAM") guidelines. A psychological patient examination had never been required nor was it advised by ASAM.  The insurance companies without notice began denying claims that did not have a psychological examination.  In addition, Blue Cross Blue Shield and UnitedHealthcare who had a demonstrated history of paying direct to a facility for California domiciled treatment centers, changed their reimbursement practice to "pay to patient" from pay to provider.  These changes in reimbursement practices, the sharp uptick in denied or delayed claims resulted in the Debtors having to file lawsuits against UnitedHealthCare for unpaid claims in excess of $120,000,000.00 as well as Blue Cross Blue Shield in California in excess of $60,000,000 and Blue Cross Blue Shield in Arizona in excess of $30,000,000 who were now directing insurance reimbursements to the patient rather than the provider.  Historically, California had for two years prior been paying the provider directly for patient care but now switched to paying the patient.

16.    Also, during the same period of time, health insurance companies put pressure on Google to restrict advertising for the treatment industry. This was done because the insurance companies could not deal with the vast increase in patients who were seeking treatment for substance abuse tied to the opioid pandemic and the resultant spike in claims being paid out. This was also soon after the passage of the Affordable Care Act that specifically mandated coverage for substance abuse treatment and in addition allowed young adults to stay on parent

health plans until the age of 26.  Insurers could also not deny claims for pre-existing conditions. This had an almost immediate detrimental impact on the Debtors and their patient censuses (i.e., the total amount of patients the Debtors serviced).  The Debtors were spending between $30,000,000 and $40,000,000 per year in Google advertising to bring clients into treatment. Within twelve (12) months the Debtors went from multiple facilities with over 600 patient beds to a census of less than 100 patients.

17.     The Debtors financial condition became worse in in 2017 when Google stopped all advertising on its platform and in order to get back on Google's platform any company in the treatment space was required to register with LegitScript (a Google partner) before they would be able to advertise again on Google.  This process took almost nine (9) months before the Debtors could restart advertising on Google.  When the Debtors did, they spent $1,000,000 on advertising in the first month and another $2,000,000 in the second month on advertising without any success in being able to attract clients.  Even with getting back on Google's platform, the Debtors were unaware of a change in Google's algorithm that while previously having the Debtors services pop up relatively early in any search results, now made the Debtors' services harder to acquire through a Google search.

18.     This change in the Debtors' ability to advertise its services to those in need through Google together with the denial of claims and the change in methodology of claims processing by the health insurance payors both had a severe detrimental impact on the Debtors' operations and on their cash flow.  The Debtors changed from having significant cash balances on hand, strong monthly cash collections from health insurance payors, to having to rely on the Keybank line of credit to fund their operations.  In addition, the Debtors spent $8,000,000 on litigation with the commercial insurance payors without success.

19.     This situation continued into 2018 and the Debtors were forced to dramatically scale back their operations. The unit holder paid approximately $18,000,000 to the Debtors during 2018 and 2019 which helped the Debtors continue its business operations. The Debtors also spoke with management consultant Alvarez & Marsal at this time to attempt an orderly sale of the business. In early 2020, the COVID pandemic struck. Once the initial lockdown started lifting, it remained extremely difficult to attract patients to treatment facilities in California and Florida as very few people wanted to be travelling across state lines to seek treatment and certainly not to two states that were severely impacted by the COVID pandemic. The vast majority of clients travel from out of state to seek treatment at the Debtors facilities. Nonetheless, the Debtors persevered and are still in existence today.

## THE DEBTORS PRE-PETITION FINANCING

20.     Prior to the Petition Date, the Debtors became indebted to, and granted certain security interest to, Keybank National Association ("Keybank"), as administrative agent for the Lenders,[3] pursuant to that certain loan and security agreements (collectively, the "Loan Agreements"). The Loan Agreements consist of the following:

(i)     Revolving Credit Notes, dated as of June 30, 2016, in the maximum aggregate amount of $20 million, executed by TM Healthcare Holdings, LLC, Arizona Red Rock Holdings, LLC, Bass Holding Company, LLC, Golden Gate Holding Company, LLC, and Treatment Management Company, LLC (collectively, the "Borrowers") in favor of the Prepetition Secured Lenders, together with related contractual agreements, as thereafter amended, supplemented and modified;

(ii)    Term Notes, dated as of June 30, 2016, in the maximum aggregate amount of $60 million, executed by the Borrowers in favor of the Prepetition Secured Lenders;

---

[3] All capitalized terms not specifically defined herein shall have the meaning provided in the Loan Agreements (as defined herein) and/or the proposed Interim Order.

  (iii) Credit and Security Agreement (as has been and may be amended from time to time, the "Credit Agreement"), dated June 30, 2016, by and among the Borrowers, KeyBank, and the Prepetition Secured Lenders, together with related contractual agreements, as thereafter amended, supplemented and modified;

  (iv) Guaranty of Payment, dated as of June 30, 2016, executed by certain Domestic Subsidiaries (as defined in the Credit Agreement), together with related contractual agreements, as thereafter amended, supplemented and modified;

  (v) Guaranty of Payment Joinder, dated as of May 23, 2017, executed by certain Domestic Subsidiaries (as defined in the Credit Agreement), together with related contractual agreements, as thereafter amended, supplemented and modified;

  (vi) Security Agreement, dated as of June 30, 2016, by and among each Domestic Subsidiary and KeyBank, together with related contractual agreements, as thereafter amended, supplemented and modified; and

  (vii) Pledge Agreements, dated as of June 30, 2016, by Arizona Red Rock Holdings, LLC, Bass Holding Company, LLC, Golden Gate Holding Company, LLC, Treatment Management Company, LLC, Arizona Care Management, LLC, Canyon Rock Management, LLC, Pacific Addiction and Treatment Company, LLC, SoCal Addiction & Treatment Company, LLC, and Sun Ray Coast Treatment Center, LLC (collectively with the Borrowers and each Domestic Subsidiary, the "Prepetition Obligors"), in favor of KeyBank.

Pursuant to the Loan Documents, in consideration of the loans and other financial accommodations extended to the Debtors under such agreements, and to secure the payment and performance of the Debtors' obligations under the Loan Documents, the Debtors granted KeyBank security interests and liens in substantially all of the Debtors' assets to the extent described in the Loan Documents.

  21. Starting in 2018, KeyBank asserted that the Borrowers defaulted under the Loan Agreements and, as a result, KeyBank was exercising its right to accelerate the maturity of all of obligations due and owing under the applicable Loan Agreement. Specifically, KeyBank

asserted that the Borrowers default causing acceleration of the Borrowers debt obligations resulted not from its failure to pay their debt obligations under the applicable Loan Agreement, but from a (i) failure to comply with certain Leverage Ratio and Fixed Charge Coverage Ratio requirements; (ii) failure to comply with the an annual audit report requirement; and (iii) the Borrowers sale, lease, transfer or disposal of assets conducted through the a confidential settlement agreement entered into between the Borrowers and UnitedHealth Group, Inc. Accordingly, KeyBank asserted that the full amount of the Borrower's obligations, $55,977,785.92, was due and owing as of July 20, 2018. As of the Petition Date, the Debtors estimate that they owe approximately $58,055,775.61 under the Loan Agreements.

## COMMENCEMENT OF THESE CHAPTER 11 CASES

22.    The Debtors can attribute the commencement of their chapter 11 cases to a number of causes; namely, the negative treatment and decision making of insurance companies and Google, the notices of default under the Loan Documents declared by KeyBank, and the COVID-19 outbreak.

23.    As described above, in 2015, insurance companies began cutting reimbursements of necessary patient services, which resulted in a negative downturn in the entire drug and alcohol treatment facility industry. At the same time, the industry began receiving negative publicity and Google dropped all drug and alcohol treatment facilities from its search provider platform. The Debtor was managing through the cut in reimbursements, but the Google decision adversely affected the Debtors' ability to obtain new patients. The Debtors eventually defaulted under the Loan Agreements. The Debtors hired an independent chief restructuring officer to stabilize the Debtors' business and began negotiating a forbearance agreement with KeyBank. The chief restructuring officer's efforts did in fact stabilize the Debtors' business, the Debtors

made significant partial payments under the Loan Agreements, and the Debtors never entered into the heavily negotiated forbearance agreement with KeyBank.

24.     In early 2020, the COVID-19 pandemic shook the world resulting in a massive shut down of the economy negatively impacting various business entities across various industries.  The Debtors were one of these industries, especially given that their business operations were performed in two states that were hit the hardest by the pandemic—Florida and California.  Moreover, over 75%—and at times, as high as 90%— of the Debtors' patients are not local, meaning they travel to obtain treatment.  As a result of the pandemic, the Debtors' were unable to provide treatment to various potential patients, as people did not want to risk traveling and potentially catching COVID-19, which resulted in a decrease in new clients, and the Debtors had to change and incorporate new protocols for sanitizing, testing and quarantining, which increased the Debtors' monthly operating expenses.  Although COVID-19 initially negatively impacted the Debtors' business operations, the Debtors anticipate that because of mental health and substance and alcohol abuse issues that have resulted from the outbreak of the COVID-19 pandemic the Debtors' business operations will be needed more than ever in the near future.  On August 7, 2020, KeyBank reasserted that the full amount due and owing under the Loan Agreements remain immediately due and payable and threatened legal action if demand was not immediately satisfied.

25.     The Debtors are filing these chapter 11 cases in order to preserve the going concern value of the Debtors' assets and operations, and then either sell its enterprise as a going concern or, in the event it cannot find a buyer for a commercially reasonable amount, restructure its debts.  The Debtors have successfully operated addiction and treatment medical facilities for many years and are well known within the regions in which they operate.  The Debtors anticipate

that a going concern sale or successful and consensual reorganization will rehabilitate their continued operations and allow the Debtors to provide its services to people who suffer from mental health and substance and alcohol abuse problems.

## THE FIRST DAY MOTIONS

26.     In connection with the commencement of the Debtors chapter 11 cases, the Debtors have filed the First Day Motions, which consist of following pleadings:

- Emergency Application to Employ Bradley S. Shraiberg, Esq. and Shraiberg, Landau & Page, P.A. as General Bankruptcy Counsel to the Debtors Effective as of the Petition Date (the "Application to Employ SLP");

- Debtors' Emergency Motion for Entry of Order Authorizing Debtors to Use Cash Collateral and Provide Adequate Assurance (the "Cash Collateral Motion");

- Expedited Motion for Order Authorizing Debtors to Pay Prepetition Wage Obligations (the "Wages Motion");

- Expedited Application to Employ Gregg F. Stewart and Rinnovo Management LLC as Chief Restructuring Officer, Effective as of September 11, 2020 (the "CRO Employment Application");

- Motion Authorizing Debtors to Temporarily Maintain (I) Existing Cash Management System and (II) Prepetition Bank Accounts (the "Cash Management Motion");

- Motion of Debtors for an Order Authorizing Payment of Prepetition Taxes and Fees (the "Taxes Motion");

- Motion for Entry of Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (II) Satisfy Payment of Prepetition Obligations On Account of and Continue to Pay Brokerage Fees; and (III) Granting Related Relief (the "Insurance Motion");

- Expedited Motion to Determine Adequate Assurance of Payment for Utility Services and Preclude Utilities from Altering, Refusing, or Discontinuing Services (the "Utilities Motion"); and

- Debtors' Ex Parte Motion for Joint Administration (the "Joint Administration Motion").

27.     I have reviewed each of the First Day Motions (including any exhibits thereto) and can attest to the veracity of the facts set forth therein.  Additionally, I believe that the relief sought in each First Day Motions are (i) necessary to enable the Debtors to operate in chapter 11 with minimum disruption to its business or loss of productivity or value, and (ii) constitutes a critical element in maintaining the Debtors' going concern value.  Factual information in support of the First Day Motions is provided below as well as in the applications and motions filed concurrently herewith.

**A.      Application to Employ SLP**

28.     By the Application to Employ SLP, the Debtors respectfully request that the Court enter an order authorizing the Debtors to employ and retain Bradley S. Shraiberg, Esq. ("Mr. Shraiberg") and Shraiberg, Landau & Page, P.A. (collectively, "SLP") as general bankruptcy counsel in each of these chapter 11 cases effective as of the Petition Date.

29.     The Debtors seek to retain SLP as its general bankruptcy counsel because of the firm's extensive experience and knowledge in the field of debtor's and creditor's rights and business reorganizations under chapter 11 of the Bankruptcy Code.  Moreover, SLP is well suited for the type of representation required by the Debtors and has substantial experience representing debtors in complex reorganization cases.

30.     To the best of the Debtors' knowledge, except as disclosed in the Application to Employ and/or the Affidavit of Mr. Shraiberg attached thereto, neither Mr. Shraiberg nor SLP presently represent any parties with interests adverse to the Debtors' estates.  Accordingly, the Debtors have determined that SLP has the resources and experience necessary to represent the

Debtors in these cases.  Further, SLP has become intimately familiar with the Debtors' business and operations and many of the legal issues that may arise in the context of these cases.

31.     I am aware that corporations may not appear *pro se* in a Federal court and that only a licensed attorney may appear on their behalf.  Because there is a myriad of relief that must be sought from the Court immediately, the Debtors will suffer immediate and irreparable harm if they are unable to obtain the services of counsel before a final hearing on the Application for approval of counsel's employment can be convened.  For example, the Debtors require the Court's approval of an agreement for the use of cash collateral.  Without the use of cash, the Debtors will be unable to operate its business and maximize the value of its assets for the benefit of its estate.

32.     It is, therefore, my belief that only with the granting of interim approval of counsel's employment will such immediate and irreparable injury be avoided.  In that regard, counsel advises that this relief has been granted in other chapter 11 cases in this District. Accordingly, in the exercise of my business judgment, it is in the best interests of the Debtors, their estates, and their creditors to retain SLP as their counsel.

**B.     Cash Collateral Motion**

33.     The Debtors seek authorization to use the cash collateral of KeyBank pursuant to a three-week cash collateral budget prepared by the Debtors for the period from the Petition Date through and including October 2, 2020.

34.     In connection with the Debtors' proposed use of cash collateral and in order to provide KeyBank with adequate protection for the aggregate diminution of the cash collateral resulting from the Debtors' use thereof, the Debtors have agreed, subject to approval of this Court, that KeyBank shall have replacement liens pursuant to section 361(2) of the Bankruptcy

Code with such liens having the same seniority and entitled to the same level of priority as the priority of KeyBank's liens against the Collateral that existed prior to the Petition Date.

35.     The Debtors propose to use the cash collateral strictly in accordance with the terms of that certain Budget prepared by the Debtors attached to the Cash Collateral Motion. The Budget covers a three-week period as set forth in **Exhibit A** attached to the Cash Collateral Motion.  The Debtors also requests that they be authorized: (i) to exceed any line item on the Budget by an amount equal to ten percent (10%) of each such line item; or (ii) to exceed any line item by more than ten percent (10%) so long as the total of all amounts in excess of all line items for the Budget do not exceed ten percent (10%) in the aggregate of the total Budget.

36.     An immediate and critical need exists for the Debtors to be permitted access to cash collateral in order to continue to operate their businesses and preserve their ongoing value. If the Debtors are not allowed to use cash collateral, their business operations will be substantially interrupted.  This would result in a significant diminution in the value of the Debtors' assets (including the cash collateral) to the detriment of the Debtors' creditors and interest holders and other harm to the Debtors' respective estates.  The proposed use of cash collateral, therefore, is essential to sustain the Debtors during these chapter 11 cases and to prevent irreparable harm to the Debtors' estates.  The Budget provides adequate funds to pay anticipated administrative expenses during the pendency of these chapter 11 cases on an emergency basis in light of the immediate and irreparable harm that the Debtors' estates will suffer should the relief sought in the Cash Collateral Motion not be granted.

37.     The proposed use of cash collateral is necessary, essential, and appropriate for the continued operation of the Debtors' business, and the preservation of the assets of the estate. Given the circumstances of this case and of the Debtors, the terms of the use of cash collateral

are fair, reasonable and adequate, and in the best interest of the Debtors' estate. The use of cash collateral provides the Debtors with working capital pursuant to the Budget, pending approval of the use of cash collateral on a permanent basis at the Final Hearing. Accordingly, I submit that granting of the relief sought is necessary and appropriate and in the best interests of the Debtors, their creditors, shareholders and patients.

**C.    Wages Motion**

38.    Through the Wages Motion the Debtors are requesting the entry of an order authorizing the Debtors to pay various pre-petition wages, salaries, earned bonuses and employee benefits of the Debtors' Employees.

39.    As of the Petition Date, the Debtors have approximately 112 employees (the "Employees")[4] who will be owed a total of approximately $228,802.39 for accrued and unpaid wages, and adjustments thereto, including the amounts that the Debtors are required by law to withhold from employee payroll checks for federal income taxes, other taxes, social security and other deductions. The next pay date is Friday, September 18, 2020. The Debtors funded payroll on Wednesday, September 16, 2020.

40.    The wages described above are based on the pre-petition services provided by the Employees from Sunday, August 30, 2020 through Saturday, September 12, 2020 and anticipated pre-petition services provided by the Employees from Sunday, September 13, 2020 through Wednesday, September 16, 2020. As part of the foregoing relief, the Debtors also seeks authorization to pay all federal and state withholding and payroll-related taxes relating to pre-petition periods including, but not limited to, all withholding taxes, Social Security taxes,

---

[4] The Employees are technically employed by Debtors Bass Employment Services, LLC ("Bass Employment") and Golden Gate Employment Services, LLC ("Golden Gate Employment"). The Employees employed by Golden Gate staff the Debtors' treatment centers in California. The Employees employed by Bass Employment, including the Debtors' officers and directors, staff the Debtors' treatment centers in Florida as well as manage the Debtors' entire operations.

and Medicare taxes, as well as all other withholdings such as insurance and other employee deductions, if any.

41.     I believe that the relief requested in the Wages Motion will enable the Debtors to maintain their current operations without interruption, thereby preserving the value of their business, and, at the same time, maintain employee morale.  Without the relief requested, the Debtors' ability to serve its patients, preserve the Debtors' going concern value and maximize the value of their assets for all creditors of their estates will be adversely affected if the Debtors are unable to retain its dedicated and loyal Employees.

**D.     CRO Employment Application**

42.     Through the CRO Employment Application the Debtors are requesting the entry of an order authorizing the employment of Gregg F. Stewart ("<u>Stewart</u>") and Rinnovo Management LLC ("<u>Rinnovo</u>") as their chief restructuring officer ("<u>CRO</u>"), effective as of the September 11, 2020.

43.     On or about September 10, 2020, the Debtors and Stewart and Rinnovo entered into an engagement agreement (the "<u>Agreement</u>"), which is attached as **<u>Exhibit A</u>** to the CRO Employment Application.  The material terms of the Agreement include:[5]

- The Debtors will retain Stewart and Rinnovo as their CRO.   Agreement, Schedule A, § 1.

- The duties of Stewart and Rinnovo as CRO include assisting in all aspects of business activities and operations, managing real estate, serving as the principal contact with creditors regarding financial and operational matters and providing information for inclusion in court filings.  *Id.* at § 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12.

- Subject to this Court's approval, Stewart and Rinnovo shall be paid by the Debtors at the rate of $375.  Agreement, ¶ 6.  In addition, Stewart and Rinnovo shall be entitled to a $25,000 completion fee, payable upon the

---

[5] Material terms of the Agreement are summarized herein for notice purposes only.  To any extent the Agreement conflicts with this Motion, the Agreement shall control.

earlier of (i) consummation of a chapter 11 plan of reorganization or (ii) the sale, transfer or other disposition of all or a substantial portion of the assets or equity of the Debtors in one or more transactions. *Id.* at ¶ 8.

- Stewart and Rinnovo shall require a retainer of $50,000. *Id.* at ¶ 11.

- Stewart and Rinnovo shall be paid by the Debtors on a monthly basis after providing notice to the United States Trustee and counsel to the secured creditor and any committee appointed and any other requesting party. *Id.* at ¶ 10

- The Debtors agree to indemnify and hold the Stewart and Rinnovo harmless under certain conditions. *Id.* at ¶¶ 12–15.

44.     Stewart is the founder of Rinnovo.  He has over 20 years of experience providing in providing financial and operations services to executives in a mix of public and private large corporate and middle market companies.  Rinnovo has also served as a court appointed fiduciary relating to matters involving administration of assets, resolution of litigation and claims adjudication, and is well-qualified to assist the Debtors in the roles contemplated by the Agreement.

45.     I believe that the requested relief in CRO Employment Application is imperative for the Debtors to successfully emerge from their chapter 11 cases.  Stewart and Rinnovo have extensive experience in providing CRO services to corporations entering the bankruptcy process. As a result, I believe that it is in the Debtors' best interests to retain Stewart and Rinnovo as their CRO throughout the duration of these chapter 11 cases.

**E.     Cash Management Motion**

46.     Through the Cash Management Motion the Debtors are requesting the entry of an order authorizing the Debtors to temporarily maintain their existing cash management system (the "Cash Management System") and prepetition bank accounts (the "Prepetition Bank Accounts") for a period of thirty (30) days.

47.     The Debtors use an intricate centralized Cash Management System comprised of seventeen (17) Prepetition Bank Accounts held at J.P. Morgan Chase Bank, N.A. to operate their businesses in the ordinary course.  The Cash Management System has several main components: (i) cash collection; (ii) cash transfers among the Debtors in respect of certain operating expenses; and (iii) cash disbursements that fund the Debtors' business operations, debt, and tax obligations. The Cash Management System allows the Debtors to control funds, ensure cash availability for each operating entity, and reduce administrative costs by facilitating the movement of funds among multiple Debtor entities.   The Debtors maintain daily oversight over the Cash Management System and implement cash management controls and procedures for entering, processing, and releasing funds.  The Debtors cash management controls include, among other things, that the receipt of funds from the Debtors business operations are transferred into a single Concentration Account held by the Florida Debtor entity, Bass Holding Company, LLC, and subsequently transferred to the California and Florida Debtor entities when corporate and administrative expenses become due and owing to cover the expenses incurred by an individual California or Florida Debtor entity in its business operations.

48.     The Debtors' Prepetition Bank Accounts generally fall into one of a number of categories, each of which is briefly described in the following table:

| Accounts[6] | Description |
|---|---|
| **Concentration Accounts**<br>*Chase account ending in 8050, 1112, and 0662.* | Prepetition Bank Accounts used to concentrate cash needed for the Debtors' operating expenses and serves as a repository for the Debtors' liquidity needs.  The Debtors currently maintain three (3) Concentration Accounts for the Debtors. |

---

[6] These descriptions of the Prepetition Bank Accounts are for illustrative purposes only.  A single Prepetition Bank Account may fall into more than one of the categories described herein.

| Accounts[6] | Description |
|---|---|
| **Management Accounts**<br>*Chase accounts ending in 0772, 9022, and 8308.* | Prepetition Bank Accounts used to facilitate and manage the transfer of funds from the Collection Accounts to the Concentration Accounts.  The Debtors currently maintain three (3) Management Accounts for the Debtors. |
| **Payroll Accounts**<br>*Chase accounts ending in 0901 and 0653.* | Prepetition Bank Accounts used to fund the Debtors' payroll related obligations.  The Debtors currently maintain two (2) Payroll Accounts for the Debtors. |
| **Collection Accounts**<br>*Chase accounts ending in 1285, 9176, 5505, 5327, 9985, 7622, and 1002* | Prepetition Bank Accounts used to collect the Debtors' various revenue streams.  The Debtors currently maintain seven (7) Collection Accounts for the Debtors. |

49.     The bulk of the Debtors' cash-on-hand is comprised of proceeds from the Debtors' ongoing business operations.  As of the Petition Date, the Debtors estimate that they have approximately $259,028.00 of cash on hand.

50.     The Debtors cash flows are consolidated into a single Prepetition Bank Account. Generally, cash flows through the Debtors through four tiers within its corporate structure: (i) the holding tier (the "Holding Tier"), consisting of (a) Golden Gate Holding Company, LLC ("Golden Gate Holding") and (b) Bass Holding Company, LLC ("Bass Holding"); (ii) the management tier (the "Management Tier"), consisting of (a) Pacific Addiction and Treatment Company, LLC ("Pacific Management"), (b) SoCal Addition & Treatment Company, LLC ("SoCal Management"), (c) Treatment Management Company, LLC ("Treatment Management"), and (d) Wellness Management Company, LLC ("Wellness Management"); (iii) the treatment providers tier (the "Treatment Providers Tier"), consisting of (a) West Coast Recovery Center, LLC ("WCR"), (b) West Coast Wellness Centers, LLC ("WCW"), and

(c) Wellness Counseling & Residential Detoxification Services, LLC ("WCRD"); and (iv) the support tier (the "Support Tier"), consisting of (a) Golden Gate Employment Services, LLC ("Golden Gate Employment") and (b) Bass Employment Services, LLC ("Bass Employment").

51.    The Debtors' Holding Tier consists of Golden Gate Holding and Bass Holding. Bass Holding receives funds transferred from the Management Tier to fund the Debtors business operations.  The Debtors operating expenses and revenues are concentrated in one of the two Concentration Account for Bass Holding and then disbursed to either the Payroll Accounts or to the Debtors' operating accounts to pay vendors and creditors and to fund the Debtors' operating costs.  Bass Holding receives funds transferred from the Concentration Account for Golden Gate Holding into its other Concentration Account to separately segregate Payroll Protection Program Funds Golden Gate received.  The Concentration Account for Golden Gate Holding is currently inactive and the Debtors intend to close said account in the near term.

52.    The Debtors' Management Tier consists of Pacific Management, SoCal Management, Treatment Management, and Wellness Management.  Pacific Management, SoCal Management, and Wellness Management receive funds transferred from the Collection Accounts into their respective Management Accounts and transfers said funds to one of the Concentration Accounts for Bass Holding.  The Debtors Management Accounts are used to facilitate and manage the transfer of funds into the Concentration Account for Bass Holding.  Treatment Management receives funds from (i) the Debtors' Continuation of Health Coverage ("COBRA") plan administrator for terminated employees who have elected to participate in the Debtors' COBRA plan and (ii) from the Debtors' employees who participate in the Debtors Health Savings Account, into its Collection Accounts, which is transferred into the applicable Management Account and then transferred into one of the Concentration Accounts for Bass

Holding.7    The Collection Accounts for Treatment Management are swept daily into the applicable Management Account.

53.    The Debtors' Treatment Providers Tier consists of WCR, WCW, and WCRD. WCR, WCW, and WCRD receive funds from the Debtors' business operations into their respective Collection Accounts.  The Collection Accounts for WCR, WCW, and WCRD are then transferred into the applicable Management Account, which are then transferred to the Concentration Account for Bass Holding.  The Collection Accounts are swept daily into the applicable Management Account and to the extent any funds are in the Collection Accounts when certain operating expenses are due and owing for the applicable entity within the Treatment Providers Tier those funds are used to fund those operating expenses.

54.    The Debtors Support Tier consists of Golden Gate Employment and Bass Employment.  Golden Gate Employment and Bass Employment receives funds from one of the Concentration Accounts for Bass Holding into their respective Payroll Accounts. The Payroll Accounts are then used to fund the Debtors' payroll related obligations.

55.    If the Debtors are required to close its Prepetition Bank Accounts at this time and interrupt its existing Cash Management System, the Debtors anticipate that there could be an enormous and unnecessary disruption in the Debtors' business operations that would cause unnecessary expenses and would negatively impact the Debtors' ability to meet post-petition obligations.  In order to ensure a smooth transition into chapter 11 with minimal disruption to the Debtors' business, it is important that the Debtors be permitted to continue to maintain its Prepetition Bank Accounts.

---

7 Under applicable law, Treatment Management is not required to separately segregate out any funds received from its COBRA plan administrator.

56.     I believe that the relief requested in the Cash Management Motion will enable the Debtors to maintain their current operations without interruption, thereby preserving the value of their business operations.

**F.      Taxes Motion**

57.     Through the Taxes Motion the Debtors are requesting the entry of an order authorizing the Debtors to pay pre-petition taxes and fees owed to certain federal, state, provincial, and local U.S. governmental units.

58.     Prior to the Petition Date, the Debtors incurred obligations to federal, state, provincial, and local governments in the United States.  As of the Petition Date, the Debtors are substantially current in the payment of assessed and undisputed pre-petition tax obligations and fees; however, certain tax obligations and fees attributable to the pre-petition period may have been paid or may have been sent checks and/or fund transfers that may or may not have been presented or cleared as of the Petition Date.  Similarly, in other cases, taxes and fees may have accrued or are accruing, or are subject to audit or review, but have not yet become due and payable and, thus, any checks or fund transfers will be issued on a post-petition basis.

59.     The Debtors continued payment in the ordinary course of business of their pre-petition tax obligations and fees will ultimately preserve the resources of the Debtors' estates, thereby promoting their prospects for a successful chapter 11 process.  If such obligations are not timely paid, the Debtors will be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues related to such obligations, including, but not limited to whether (i) the obligations are priority, secured, or unsecured in nature; (ii) the obligations are pro-ratable or fully pre-petition or post-petition; and (iii) penalties, interest, attorneys' fees and costs can continue to accrue on a post-petition basis and, if so, whether such penalties, interest, attorneys' fees, and costs are priority, secured, or unsecured in nature.

60.     I believe that the relief requested in the Taxes Motion will enable the Debtors to maintain their current operations without interruption, thereby preserving the value of their business operations.

**G.     Insurance Motion**

61.     Through the Insurance Motion the Debtors are requesting the entry of an order authorizing the Debtors to (i) continue insurance overage entered into pre-petition and satisfy pre-petition obligations related thereto in the ordinary course of business (the "Insurance Policies"); (ii) renew, amend, supplement, extend, or purchase insurance coverage in the ordinary course of business on a post-petition basis; and (iii) satisfy payment of pre-petition obligations on account of and continue to pay brokerage fees to their insurance brokers.

62.     In the ordinary course of business, the Debtors pay their obligations associated with their Insurance Policies (collectively, "Premiums") through its (i) Insurance Brokers (as defined below) or (ii) Premium Financing Agreement (as defined below).  The Debtors typically prepay their entire yearly Premiums for the Insurance Policies not subject to the Premium Financing Agreement (as defined below) on or around the start of each policy period.  Most of the Insurance Policies are one year in length and renew at various times throughout the year.  The aggregate annual amount of Premiums for the Insurance Policies, not including applicable taxes and surcharges, or deductibles, is approximately $635,122.46.

63.     The Debtors obtain the Insurance Policies primarily through insurance brokers (the "Insurance Brokers").  The Insurance Brokers assist the Debtors in obtaining comprehensive insurance coverage for their operations in the most cost-effective manner, negotiating policy terms, provisions, and premiums, and providing ongoing support throughout the applicable policy periods.  The Insurance Brokers are paid either through a commission, a flat fee, or a combination of a commission and flat fee for its services (the "Brokerage Fees").

64.     The Debtors finance its directors' and officers' liability insurance policies (the "D&O Insurance Policies") through a premium financing agreement (the "Premium Financing Agreement") with IPFS Corporation ("IPFS").  The Premium Financing Agreement allows the Debtors to pay their D&O Insurance Policies' premiums over time subject to a 5.95% annual percentage rate charge (the "Premium Financing Agreement Fees").

65.     As of the Petition Date, the Debtors do not believe that they owe any amounts (i) on account of Premiums related to the Insurance Policies; (ii) to their Insurance Brokers; or (iii) on account of the Premium Financing Agreement Fees related to the Premium Financing Agreement.

66.     I believe that the relief requested in the Insurance Motion will enable the Debtors comply with the applicable Bankruptcy Code section that requires the Debtors to maintain their existing coverage.  Further, I believe that failure to timely honor any outstanding pre-petition obligations on account of the Insurance Policies could negatively affect the Debtors' ability to enter into such amendments, supplements, extensions, or new policies and coverage.  As a result, I believe that continuation of the Insurance Policies is essential to preserving the value of the Debtors' assets and minimizing exposure to risk during the pendency of these chapter 11 cases.

**H.      Utilities Motion**

67.     Through the Utilities Motion the Debtors are requesting entry of an order (i) prohibiting the Debtors utility providers (the "Utility Providers") from altering, refusing, or discontinuing service on account of prepetition debts; and (ii) approving procedures for resolving any dispute concerning adequate assurance in the event that a Utility Provider is not satisfied with the adequate assurance procedures (the "Adequate Assurance Procedures").

68.     In their business operations, the Debtors use certain utility services to ensure that their patients and staff have access to services necessary for daily functions. The Debtors maintain multiple accounts with various Utility Providers in Florida and California.

69.     I believe that the relief requested in the Utility Motion is essential to preserving the value of the Debtors' assets and minimizing exposure to risk during the pendency of these chapter 11 cases.

## I.      Joint Administration Motion

70.     Through the Joint Administration Motion the Debtors are requesting entry of an order approving that their chapter 11 cases be jointly administered for procedural purposes only, and that one file and one docket be maintained under TM Healthcare Holdings, LLC.

71.     The Debtors are an integrated business with common ownership and control.  The Debtors also share a number of financial and operational systems.  As a result, many of the pleadings, hearings, and orders that will arise in these cases will affect each and every Debtor. Joint administration of these cases, therefore, will reduce fees and costs by avoiding duplicative filings, objections, notices, and hearings.

72.     I believe that joint administration will not adversely affect the Debtors because the Joint Administration Motion only requests administrative consolidation of the Debtors' estates and will significantly increase the Debtors timely exit from their chapter 11 cases.


*[Remainder of page left intentionally blank]*

## CONCLUSION

73.     For the reasons stated herein and in each of the First Day Motions, the relief sought therein is in the best interests of the Debtors' estates and their creditors.  Therefore, on behalf of the Debtors, I respectfully request that the First Day Motions be granted.

### 28 U.S.C. § 1746 DECLARATION

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed on September 17, 2020.

_____

Paul Kamps
Chief Financial Officer of the Debtors

## Exhibit A

**Legal Organizational Chart**

*Error! Unknown document property name.*

Ownership Tier
Regional Holding Cos
Management Companies
Treatment Providers
Support Companies
Real Estate Companies
Bryan T. Deering, Sr. Irrevocable Family Trust dated 1/8/14 (49.5%) - nonvoting
Debra A. Deering Irrevocable Family Trust dated 1/24/14 (49.5%) - nonvoting
Bryan T. Deering, Sr. Living Trust dated 1/31/11 (1%) - voting
TMHC Management, LLC
TM Healthcare Holdings, LLC
Arizona Red Rock Holdings, LLC
Golden Gate Holding Company, LLC
Bass Holding Company, LLC
Canyon Rock Management, LLC
Arizona Care Management, LLC
Pacific Addiction and Treatment Company, LLC
Sun Ray Coast Treatment Center, LLC
SoCal Addiction & Treatment Company, LLC
Treatment Management Company, LLC
Executive Management Company of Florida, LLC
Treasure Coast Management Company, LLC
Wellness Management Company, LLC
Tarpon Management Services, LLC
Red Rock Addiction and Treatment Company, LLC
Serenity Care Center, LLC
Red Sand Laboratories, LLC
Red Rock Wellness Care Center, LLC
West Coast Recovery Center, LLC
Sun Ray Holding Company, LLC
West Coast Wellness Centers LLC d/b/a Wellness Counseling Vida Entera
Sunshine Doctors Group, LLC
Institute for Therapeutic Change, LLC
The Lukens Institute, LLC d/b/a Executive Recovery Center
Treasure Coast Recovery, LLC d/b/a Prestige Recovery Center
Wellness Counseling & Residential Detoxification Services, LLC
Jensen Beach Wellness, LLC
National Laboratories, LLC
Red Rock Client Services, LLC
Red Rock Employment Services, LLC
West Coast Client Services, LLC
Sun Ray Coast Client Services, LLC
Golden Gate Employment Services, LLC
Aid In Recovery, LLC
National Drug Testing Supplies, LLC
Lukens Client Services, LLC
Treasure Coast Client Services, LLC
Bass Employment Services, LLC
Red Rock Real Estate Holdings, LLC
West Coast Housing, LLC
Inner Harbour Rentals, LLC
Arizona Region
California Region
Florida Region
10/25/2018
41 Companies, 3 Regions: 12 Treatment Providers, 2 Clinical Laboratories, 10 Employee Support Companies and 3 Real Estate Companies

